## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CARA ELIZABETH LIBERTO DODSON,   *

    **Plaintiff,**   *

**v.**   *       Civil Action No. EA-23-169

THE LUTHERAN VILLAGE AT   *
MILLERS GRANT, INC.,
       *
    **Defendant.**   *

       *

## MEMORANDUM OPINION

Plaintiff Cara Elizabeth Liberto Dodson initiated the above-captioned action on December 15, 2022, asserting a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII), based on allegations that Defendant The Lutheran Village at Millers Grant, Inc. (Lutheran Village) refused to reasonably accommodate her bona fide religious belief and then terminated her employment.[1]  ECF No. 1.  Pending before the Court are Lutheran Village's renewed motion for summary judgment (ECF No. 45) and Ms. Dodson's motion for leave to produce evidence and modify the scheduling order (ECF No. 55), each of which is fully briefed (ECF Nos. 48, 54; ECF No. 58).[2]  No hearing is necessary.  Local Rule 105.6 (D. Md. 2023).  For the reasons set forth below, Lutheran Village's motion is granted, and Ms. Dodson's motion is denied.

---

[1]  Although the Court's Case Management/Electronic Case Files (CM/ECF) system identifies the date on which the Complaint was filed as January 3, 2023, the date stamp on the first page of the Complaint reflects that it was received at the United States Courthouse in Baltimore, Maryland, on December 15, 2022.  ECF No. 1.  The timeliness of Ms. Dodson's Complaint was addressed in a prior Memorandum Opinion issued in this case.  ECF No. 41; *Dodson* v. *Lutheran Vill. at Millers Grant, Inc.*, Civil Action No. EA-23-169, 2024 WL 3597201, at *3 (D. Md. July 30, 2024).

[2]  Ms. Dodson elected not to file a reply to Lutheran Village's response in opposition.

## I.    BACKGROUND

Ms. Dodson pleads one count of religious discrimination in violation of Title VII in the Complaint.  ECF No. 1 at 4–5.[3]  Specifically, she alleges that her employment was unlawfully terminated after Lutheran Village denied her request for a religious accommodation to exempt her from receiving the Coronavirus Disease 2019 (COVID-19) and influenza vaccines that Lutheran Village required of all employees.  *Id.* at 11–17.

### A.    Factual Background

Ms. Dodson is a licensed occupational therapist and integrative nutrition health coach.  ECF No. 48-4 at 13.  She received her Bachelor of Science and Master of Science degrees from Towson University in 2017.  *Id.*  Ms. Dodson's "religion is Christianity.  She has been a believer for 24 years."  *Id.* at 14.  She worships at New Life Bible Church in Frederick, Maryland, and previously at Mount Airy Baptist Church in Mount Airy, Maryland.  *Id.* at 14–15.

Between March 2019 and February 2022, Ms. Dodson was employed as an occupational therapist at Lutheran Village, which is a skilled nursing facility in Ellicott City, Maryland.[4]  ECF Nos. 1 at 9 ¶ 5; 11 at ¶ 3.E.2; 48-4 at 10; 48-9 ¶ 2.[5]  In the course of her work at Lutheran Village, Ms. Dodson could be in "very close proximity with [her] clients," and at times she would "actually physically touch[ ] [her] clients."  ECF Nos. 48-8 at 22:7–14.  The proximity between Ms. Dodson and her clients and the percentage of time she would touch her clients

---

[3]  Page numbers refer to the pagination of the Court's CM/ECF system printed at the top of the cited document, except that page numbers of exhibits that are deposition transcripts refer to the page and line number of the deposition transcript.

[4]  During this period of time, Ms. Dodson worked as an occupational therapist at other facilities.  ECF No. 48-4 at 9–10.

[5]  The parties' deposition excerpts filed in support of their summary judgment filings have some overlap.  For ease of reference the Court cites only to one party's exhibit in support of an undisputed fact.

would depend on the client and their needs. *Id.* at 23:15–19, 24:12–15. Client transfers would require Ms. Dodson to "be very close," although the "level of physical closeness or touch" would depend on the type of transfer. *Id.* at 25:4–14. For example, a client with "a broken leg or an arm or overall deconditioning" might require Ms. Dodson to "hold[ ] the back of their pants," whereas other transfers "[m]ight be a bear hug" or call for Ms. Dodson and the client to be "a couple of feet apart." *Id.* at 26:4–13. Ms. Dodson would also use "a guided hand-over-hand technique" with some patients, where she "would put [her] hand physically over their hand and go through the motion for them." *Id.* at 28:17–21.

Lutheran Village's "Team Member Vaccination Requirement" policy, which was issued on September 30, 2015, and revised on October 14, 2020, required annual vaccinations absent a medical or religious exemption. ECF No. 48-7 at 38–39. This policy noted that "[b]ecause we serve individuals with high health risks, team member requests for exemption from the vaccination requirement will generally not be granted. Doing so would likely create an undue hardship on the organization's ability to maintain a safe and healthful environment for residents, team members, and others." *Id.*

On January 6, 2021, Ms. Dodson requested a religious accommodation to exempt her from receiving the COVID-19 vaccine. ECF No. 48-5. To Ms. Dodson's knowledge, "none of the leaders of [her] church advised that it was okay to receive the COVID[-19] vaccine." ECF No. 54-3 at 109:2–5. Lutheran Village granted her request because at that time the COVID-19 vaccine "was under emergency use authorization only" and there was not "a lot of data" about the vaccine. ECF No. 48-7 at 11:14–12:5. Between being granted this exemption and termination of her employment, Ms. Dodson used personal protective equipment (PPE) while working at Lutheran Village, including a "gown, gloves, foot covers, face shield, goggles, gloves, mask, [and] N95 respirator." ECF No. 48-4 at 14. She also "maintained proper

3

distancing," "completed the proper sanitary protocols," "performed standard precaution hygiene," "participated in temperature checks," and "participated in regular testing." *Id.*

In September 2021, Lutheran Village issued a policy that required all staff to be vaccinated against COVID-19 unless they were granted a medical or religious exemption. ECF Nos. 1 at 11 ¶ 8; 48-4 at 7 (adopting paragraphs 1–19 of the Complaint into Ms. Dodson's answers to interrogatories); 48-6 at 3. On September 30, 2021, Ms. Dodson again requested a religious accommodation to exempt her from Lutheran Village's COVID-19 and influenza vaccine mandates. ECF No. 48-6. In support of her accommodation request, Ms. Dodson submitted a "Religious Exemption Statement." ECF No. 48-8 at 14–19. This statement asserted, among other things, that "[t]he Plaintiff is opposed to receiving the COVID-19 vaccine and other vaccines that use aborted fetal tissue." *Id.* at 14; *see also* 48-8 at 20. Ms. Dodson requested an exemption from the COVID-19 and influenza vaccine mandates based on her "belief that the vaccine was tested and manufactured using aborted fetal cells." ECF No. 54-3 at 109:6–14. Although Ms. Dodson was concerned that the COVID-19 vaccine had not been adequately tested, she "requested a religious exemption, not a medical exemption." *Id.* at 109:18–110:10. Ms. Dodson was "never worried about contracting COVID[-19]" because she "really do[esn't] get sick." *Id.* at 110:14–19.

On December 20, 2021, Lutheran Village informed Ms. Dodson that it had denied her accommodation request. ECF No. 48-7 at 22. Lutheran Village's decision was informed by guidance from religious leaders, the Maryland Department of Health, and the United States Centers for Disease Control and Prevention (CDC). ECF No. 45-3 at 21:8–23:10, 31:20–22, 37:14–16. The denial letter explained that Lutheran Village had evaluated Ms. Dodson's position, "including the close contact [she] may have with fellow team members and medically vulnerable residents in the course of [her] work." ECF No. 48-7 at 22. Lutheran Village

informed Ms. Dodson "that granting [her] an exemption from COVID-19 vaccinations and the annual influenza vaccine could create a higher risk of the spread of COVID-19 to residents and team members." *Id.* It went on to explain that "[t]his poses an undue hardship on [Lutheran Village] as [it] strives to provide a safe place for residents to live and team members to work." *Id.* Lutheran Village acknowledged that although Ms. Dodson's "request for exemption from the COVID-19 vaccine was approved earlier this year, circumstances have since changed." *Id.* "[M]ost religions . . . actively encourage their members to receive the vaccine against COVID-19. Maryland's Department of Health . . . requires those who work in skilled nursing facilities like [Lutheran Village] to be vaccinated, and the Occupational Safety and Health Administration (OSHA) has introduced vaccine requirements for large employers like [Lutheran Village]." *Id.* Lutheran Village noted that the organization had "experienced many resident deaths and team member illnesses due to the [COVID-19] virus." *Id.* Lutheran Village further explained that it "took steps to mandate the inoculations prior to the widespread availability of the vaccine because we know it's the only way to provide some layer of protection for our residents and team members. We owe it to them to do everything we can to keep them safe." *Id.*

The deposition testimony of Lutheran Village's corporate representatives reflects that Ms. Dodson's request was denied for several reasons. First, there was "a global pandemic that ended up killing over 7 million people in the world, over 1 million in the United States." ECF No. 45-3 at 53:20–22. Many of the individuals afflicted by COVID-19 were "older adults who [Lutheran Village] serve[s,]" . . . "especially those who were compromised in some way" like "those in nursing homes." *Id.* at 54:1–4. Lutheran Village was "trying to manage the risk" and "use[ ] all of the tools that [it] had," including "screening, testing, PPE, and vaccination." *Id.* at 43:5–9, 45:9–10, 54:22–55:1. Lutheran Village testified that none of the preventative measures are "100 percent" effective, so "the best approach to stop somebody from getting infected is [to

use] all of those [preventative measures] together." *Id.* at 45:8–13. Lutheran Village also considered "the number of deaths in the nation [and] in Maryland," as well as the vaccine mandates issued by federal and state agencies. ECF No. 48-7 at 83:17–84:3.

Lutheran Village's corporate representative testified that a further consideration was that the COVID-19 vaccine was no longer under emergency use authorization and "had been granted full approval by the [United States Food and Drug Administration] (FDA)." *Id.* at 12:11–13:1, 79:5–7. Lutheran Village found it relevant that "much more was known about the vaccine" and "most religions actively encouraged members to receive the vaccine." *Id.* at 79:7–10. Lutheran Village acknowledged that granting Ms. Dodson's request for a religious accommodation would not have resulted in increased financial cost. *Id.* at 9:14–10:1. Ultimately, Lutheran Village concluded that granting Ms. Dodson's exemption "was an undue hardship as [it] was trying to save lives." ECF No. 45-3 at 55:12–13; *see also id.* at 54:5–8.

Lutheran Village's denial letter advised Ms. Dodson that if she did not receive the vaccines by set dates she would be placed on a short-term leave of absence for 30 days and then removed from its payroll. ECF No. 48-7 at 22. Ms. Dodson responded by stating, "I'm sorry, but a few months['] time and [ ] COVID-19 ha[ve] not change[d] my sincerely held religious beliefs. My religious leaders still support the decision to decline the COVID-19 vaccination, as murdering unborn children for scientific research is still considered immoral, unethical, and unconscionable." ECF Nos. 1 at 13 ¶ 10; 48-4 at 7. Lutheran Village corresponded again with Ms. Dodson to advise her of the vaccination deadline and potential for placement on short-term unpaid leave and termination. ECF No. 1 at 13 ¶ 13; 48-4 at 7. Ultimately, Lutheran Village terminated Ms. Dodson's employment on February 15, 2022. ECF No. 1 at 14 ¶ 14; 48-4 at 7.

### B.    Relevant Procedural History

The Court originally set August 28, 2023, as the deadline for all discovery.  ECF No. 19. Although Ms. Dodson was initially self-represented, counsel entered an appearance on her behalf on August 1, 2023.  ECF No. 22.  On August 30, 2024, the Court granted Ms. Dodson's motion to modify the scheduling order and extended the deadline for completion of all discovery until December 28, 2023.  ECF Nos. 23, 26.  Following an unsuccessful settlement conference and at the Court's direction, the parties filed a joint status report on February 6, 2024, in which Lutheran Village indicated that it intended to file a dispositive motion and Ms. Dodson requested an extension of time to name experts after deposition of Lutheran Village's corporate representatives.  ECF No. 35 ¶¶ 3–4.  The following day, the Court entered a Paperless Order that set a briefing schedule for Lutheran Village's motion and "directed [the parties] to submit a joint proposed amended scheduling order that encompasses all of the remaining deadlines in the case and identifies the good cause supporting an extension of the deadlines."  ECF No. 36.  The parties did not do so.

Thereafter, the Court denied Lutheran Village's motion without prejudice to renew its summary judgment motion after the close of discovery.  ECF Nos. 41, 42.  The Court extended the discovery deadline until November 1, 2024, and set a dispositive motion deadline of December 2, 2024.  ECF No. 42.  Lutheran Village timely renewed its summary judgment motion.  ECF No. 45.  After the Court extended Ms. Dodson's time to respond to the motion, she filed first her opposition on January 7, 2025, and subsequently, on January 22, 2025, a motion for leave to produce evidence and amend the scheduling order.  ECF Nos. 48, 55.

## II.    DISCUSSION

Title VII makes it unlawful for an employer, among other things, "to discriminate against any individual with respect to [their] compensation, terms, conditions, or privileges of

employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). This "requires employers to accommodate the religious practice of their employees unless doing so would impose an 'undue hardship on the conduct of the employer's business.'" *Groff* v. *DeJoy*, 600 U.S. 447, 453-454 (2023) (quoting 78 Stat. 253, as amended, 42 U.S.C. § 2000e(j)). Lutheran Village moves for summary judgment on the grounds that Ms. Dodson's religious accommodation would have caused undue hardship because it would have "increase[d] the risk of further spreading the [COVID-19] virus to [its] elderly and medically vulnerable patients and its employees." ECF No. 45 ¶ 1. In opposition, Ms. Dodson relies on the report of an expert to challenge the safety and efficacy of COVID-19 vaccine. ECF Nos. 48 ¶ 1; 48-2 at 6–8. Because Ms. Dodson did not disclose this expert until after discovery had closed and Lutheran Village had moved for summary judgment, she moves pursuant to Federal Rule of Civil Procedure 56(d) for leave to produce evidence and modify the scheduling order. ECF No. 55.

### A.      Standard of Review

Summary judgment motion practice "is properly regarded . . . as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Federal Rule of Civil Procedure 56(a) provides that the district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphasis in original). A material fact is one that "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about

a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Thus, to defeat summary judgment, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat. Bank of Ariz.* v. *Cities Serv. Co.*, 391 U.S. 253, 288-289 (1968). On the other hand, summary judgment "is justified if, from the totality of the evidence presented, including pleadings, depositions, answers to interrogatories, and affidavits, the court is satisfied that there is no genuine factual issue for trial and the moving party is entitled to judgment as a matter of law." *Sylvia Dev. Corp.* v. *Calvert Cnty., Md.*, 48 F.3d 810, 817 (4th Cir. 1995).

The Fourth Circuit Court of Appeals has cautioned that summary judgment "cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs* v. *North Carolina Admin. Off. of the Cts.*, 780 F.3d 562, 568-569 (4th Cir. 2015) (quoting 10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER ET AL., FEDERAL PRACTICE AND PROCEDURE § 2728 (3d ed. 1998)). At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In doing so, the district court "must view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [its] favor without weighing the evidence or assessing the witnesses' credibility." *Baynard* v. *Malone*, 268 F.3d 228, 234-235 (4th Cir. 2001). To survive summary judgment, the nonmoving party must provide evidence, "not unsupported conjecture." *Graves* v. *Lioi*, 930 F.3d 307, 324 (4th Cir. 2019). Thus, "[h]earsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment." *Alston* v. *Astrue*, Civil Action No. L-10-3446, 2012 WL 665982, at *4 (D. Md. Feb. 28, 2012), *aff'd*, 474 Fed. Appx. 390 (4th Cir. 2012).

Summary judgment must "be refused where the nonmoving party has not had the
opportunity to discover information that is essential to [its summary judgment] opposition."
*Anderson*, 477 U.S. at 250 n.5.  Federal Rule of Civil Procedure 56(d) provides that if the non-
moving party "shows by affidavit or declaration that, for specified reasons, it cannot present facts
essential to justify its opposition, the court may: (1) defer considering the motion or deny it;
(2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other
appropriate order."  Fed. R. Civ. P. 56(d).  Diligence in conducting discovery is required for such
a motion to be approved.  The Fourth Circuit has explained that "nonmovants do not qualify for
Rule 56(d) protection where they had the opportunity to discover evidence but chose not to."
*McCray* v. *Maryland Dep't of Transp., Maryland Transit Admin.*, 741 F.3d 480, 484 (4th Cir.
2014); *see also Schaeffer* v. *Mayor & City Council of Baltimore*, Civil Action No. CCB-22-1539,
2024 WL 3200610, at *9 (D. Md. June 26, 2024) ("When a party's own delay results in a failure
to gather evidence, Rule 56(d) provides no shelter from a motion for summary judgment.").

Rule 56(f) has procedural requirements that must be satisfied.  A "party may not simply
assert in its brief that discovery was necessary and thereby overturn summary judgment when it
failed to comply with the [rule's] requirement."  *Evans* v. *Technologies Applications & Serv.
Co.*, 80 F.3d 954, 961 (4th Cir. 1996).  As the text of the rule makes clear, a Rule 56(d) motion
must be supported by an affidavit or declaration, the purpose of which "is to ensure that the
nonmoving party is invoking the protections of [the rule] in good faith and to afford the trial
court the showing necessary to assess the merit of a party's opposition."  *Harrods Ltd.* v. *Sixty
Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (internal quotation marks and citation
omitted); *see also Ahmed* v. *Salvation Army*, Civil Action No. CCB 12-707, 2012 WL 6761596,
at *10 (D. Md. Dec. 28, 2012), *aff'd*, 549 Fed. Appx. 196 (4th Cir. 2013) (A Rule 56(d) affidavit
"must specify why facts precluding summary judgment cannot be presented," including

"identifying the probable facts not available and what steps have been taken to obtain these facts.") (internal quotation marks and citation omitted).  The Fourth Circuit has "warned litigants that we 'place great weight on the Rule 56([d]) affidavit,'" and that failure to file a supporting affidavit "'is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods Ltd.*, 302 F.3d at 244 (quoting *Evans*, 80 F.3d at 961).  Nevertheless, an affidavit may not be necessary if the nonmoving party's objections are "the functional equivalent of an affidavit" and "the nonmoving party was not lax in pursuing discovery."  *Id.* at 244-245 (internal quotation marks and citation omitted).

### B.    Motion for Leave to Produce Evidence

Ms. Dodson moves pursuant to Federal Rule of Civil Procedure 56(d) to "for leave to present facts, by way of affidavit of a medical expert, essential to justify her opposition to the defendant's assertion in a motion for summary judgment that exempting unvaccinated workers increases the risk of . . . the spread of COVID-19 infection and imposes an undue burden."  ECF No. 55 at 1.  The motion is flawed for myriad reasons.  First, Ms. Dodson has not complied with the procedural requirements of a Rule 56(d) because the motion is unsupported by an affidavit or declaration, something the Court cannot overlook because she has been lax in pursuing discovery.  *Harrods Ltd.*, 302 F.3d at 244-245.  More fundamentally, Rule 56(d) relief is unavailable to Ms. Dodson because she did not exercise diligence in pursuing the expert discovery on which she now seeks to rely in opposition to Lutheran Village's renewed motion.  The period allotted for discovery in this case was more than ample.  The Court enlarged the period for discovery three times, which cumulatively extended the initial deadline from August 28, 2023, until November 1, 2024.  ECF Nos. 19, 26, 42.  Thus, Ms. Dodson had more than 18 months to identify and properly disclose an expert, 15 of which she enjoyed the benefit of counsel.  ECF Nos. 19, 22, 42.

11

Ms. Dodson attempts to justify her delay based on her assertion that she did not know "the basis for Lutheran Village's justification for [t]his vaccine mandate" until she deposed Lutheran Village's corporate representative. ECF No. 55-1 at 3. This argument in unavailing. The reason for Lutheran Village's denial of Ms. Dodson's religious accommodation request was evident even before she filed suit. As Lutheran Village correctly notes (ECF No. 58 at 2–3), Ms. Dodson's Complaint quotes correspondence she received from Lutheran Village that explained its rationale: "After careful consideration, we have determined that granting you an exemption from COVID-19 vaccinations and the annual influenza vaccine could create a higher risk of the spread of COVID-19 to residents and team members. This poses an undue hardship." ECF No. 1 ¶ 9; *see also* ECF No. 1-3. It remains to be determined whether Lutheran Village's denial of the request was lawful, *see infra* III.C., but it cannot be said that the reason for its determination was unclear. Moreover, the fact that Lutheran Village intended to assert an undue burden defense to Ms. Dodson's Title VII claims has been known since Lutheran Village answered the Complaint. ECF No. 11 at 7 ("Plaintiff's claims are barred because her requests for accommodations would have caused Defendant Lutheran Village undue hardship."). This defense theory was set forth in discovery responses, as well as Lutheran Village's initial motion, which was fully briefed and resolved. ECF Nos. 37 ¶ 3 (arguing undue burden); 37-1 at 1, 10–12 (same); 58 at 3–4 (summarizing discovery responses).

Even if Ms. Dodson did not know of the need for an expert until the corporate representative depositions, she still failed to exercise diligence. Ms. Dodson asserts that she deposed Lutheran Village's corporate designees on October 18, 2024. ECF No. 58 at 2. At that time, nearly two weeks remained before the close of discovery (ECF No. 42), yet Ms. Dodson did not seek to extend the discovery deadline. Nor did she file her Rule 56(d) motion in response to the pending renewed motion for summary judgment. Instead, 51 days after Lutheran Village

filed its renewed motion (15 days after Ms. Dodson had opposed that motion) Ms. Dodson filed

her Rule 56(d) motion.  The history of this case makes plain that Rule 54(d) relief is unavailable

to Ms. Dodson.  *E.g.*, *Schaeffer*, 2024 WL 3200610, at *10 (denying a Rule 56(d) motion where

plaintiff had the benefit of four months of discovery because plaintiff "was afforded a more-than-

satisfactory opportunity to discover essential evidence, which [wa]s all that he [wa]s due").

Although styled as a Rule 56(d) motion, in actuality, Ms. Dodson does not seek to

conduct more discovery.  Instead, she "essentially seeks amendment of the court's scheduling

order to reopen the discovery period" pursuant to Federal Rule of Civil Procedure 16(b)(4) so

that she can disclose an expert not previously identified in the 18-month period of discovery in

this case.  *See Wilson* v. *National R.R. Passenger Corp.*, Civil Action No. JRR-22-2884, 2025

WL 885836, at *6 (D. Md. Mar. 20, 2025).  This, too, fails.  Rule 16(b)(4) provides that a

scheduling order "may be modified only for good cause and with the judge's consent."  Fed. R.

Civ. P. 16(b)(4).  "[T]he 'touchstone' of that good cause requirement is 'diligence.'"  *Wilson*,

2025 WL 885836, at *6 (quoting *Faulconer v. Centra Health, Inc.*, 808 Fed. Appx. 148, 152 (4th

Cir. 2020)); *see also Potomac Elec. Power Co.* v. *Electric Motor Supply, Inc.*, 190 F.R.D. 372,

375 (D. Md. 1999) ("Properly construed, 'good cause' means that scheduling deadlines cannot

be met despite a party's diligent efforts.") (internal quotation marks and citation omitted).  Here,

Ms. Dodson's lack of diligence negates any showing of good cause.[6]

At this juncture in the case, when discovery has closed and Lutheran Village has filed a

dispositive motion, Ms. Dodson cannot foist an untimely, previously undisclosed expert upon her

---

[6] Lutheran Village further argues that Ms. Dodson's belated expert disclosure fails to
comply with the requirements of Federal Rule of Civil Procedure 26 because Ms. Dodson has not
produced a list of cases in which the expert testified as an expert in the last four years and the
expert's report is unsigned.  ECF No. 54 at 2; Fed. R. Civ. P. 26(a)(2)(B), (a)(2)(B)(v).  Ms.
Dodson's court filings do not appear to satisfy these requirements, which supplies yet another
basis on which to exclude her expert, as Ms. Dodson has not shown that such failure was
substantially justified or harmless.  ECF Nos. 48-2, 48-3; Fed. R. Civ. P. 37(c)(1).

adversary or insert it into the Court's summary judgment analysis.  The Federal Rules of Civil

Procedure do not countenance such tactics.  Consistent with the decisions of courts in this

Circuit, Ms. Dodson's request for Rule 56(d) relief or to amend the scheduling order to permit

disclosure of an untimely expert report is denied.  *E.g.*, *Clayton* v. *Nationwide Mut. Ins. Co.*, 260

F. Supp. 3d 514, 521-522 (D.S.C. 2017) (denying a Rule 56(d) motion where it was evident from

the Complaint that "the cause of the mold growth would be a . . . disputed issue of fact at trial,"

plaintiff had notice of the defendant's expert and seven months in which to depose him, and

plaintiff failed to explain why this was an insufficient opportunity to conduct the discovery she

claimed to be necessary); *Bambarger* v. *Ameristep, Inc.*, No. 7:12CV280, 2013 WL 6222540, at

*4 (W.D. Va. Nov. 29, 2013) (holding that "Rule 56(d) is not intended as a mechanism for

correcting an expert's deposition"); *Holmes* v. *Norco Indus., Inc.*, No. 9:05-CV-01991-PMD,

2006 WL 8445333, at *2 (D.S.C. Feb. 14, 2006) (denying a request to dismiss the summary

judgment motion as premature by plaintiffs who were "in the process of retaining an expert")

(internal quotation marks and citation omitted).  The Court will not consider the proffered expert

report in deciding Lutheran Village's renewed motion for summary judgment.

  **C.**  **Motion for Summary Judgment**

  Under Title VII, "an employer has a 'statutory obligation to make reasonable

accommodation for the religious observances of its employees, short of incurring an undue

hardship.'"  *Equal Emp't Opportunity Comm'n* v. *Firestone Fibers & Textiles Co.*, 515 F.3d 307,

312 (4th Cir. 2008) (quoting *Trans World Airlines, Inc.* v. *Hardison*, 432 U.S. 63, 75 (1977)); *see*

*also* 42 U.S.C.A. § 2000e(j) (defining "religion" as "all aspects of religious observance and

practice, as well as belief, unless an employer demonstrates that [it] is unable to reasonably

accommodate to an employee's . . . observance or practice without undue hardship on the

conduct of the employer's business").

14

In religious accommodation cases, the Court employs a burden shifting scheme similar to that articulated in *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792 (1973). *Firestone Fibers & Textiles Co.*, 515 F.3d at 312. Under this analytical rubric, a plaintiff must first establish a prima facie claim, which then shifts the burden to the employer to show that it could not reasonably accommodate the plaintiff's religious needs without undue hardship. *Id.* To establish a prima facie religious accommodation violation, "an employee must prove that: (1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *United States Equal Emp't Opportunity Comm'n* v. *Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017) (alteration in original) (internal quotation marks and citation omitted). Here, Lutheran Village does not argue that Ms. Dodson failed to establish a prima facie case, but focuses instead on the undue hardship analysis. ECF No. 45; *see also* ECF No. 48-1 at 7. Thus, the Court will assume without deciding that the undisputed material facts establish a prima facie failure-to-accommodate claim.

To establish an undue hardship, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 470. The United States Supreme Court has instructed that courts should resolve the question of undue hardship in a "common-sense manner" after considering "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Id*. at 470-471 (alteration in original) (internal quotation marks and citation omitted). The costs associated with a religious accommodation do not need to be economic. *Id.* at 475 (Sotomayor, J., concurring) (recognizing that undue hardship analysis may encompass the impact of an accommodation upon a business's employees). "For instance, courts have found that non-

economic costs such as damage to employee morale, compromise of a collective bargaining agreement or seniority system, or unequal treatment of other employees, can constitute undue hardships." *United States Equal Emp't Opportunity Comm'n* v. *Greyhound Lines, Inc.*, 554 F. Supp. 3d 739, 752 (D. Md. 2021) (collecting cases); *see also Equal Emp't Opportunity Comm'n* v. *The GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) ("A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship for an employer-prison.").

In the context of cases involving religious accommodation claims related to vaccination against COVID-19, "[n]umerous courts have found the possibility of an unvaccinated individual getting others sick to be a non-speculative risk that a court may consider when performing an undue hardship analysis." *Bordeaux* v. *Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1136 (C.D. Cal. 2023) (collecting cases), *aff'd*, No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025); *see also Yockey* v. *Greater Baltimore Med. Ctr., Inc.*, Civil Action No. ABA-23-512, 2025 WL 860158, at *5 (D. Md. Mar. 18, 2025) (Non-economic costs "include[ ] accommodations unreasonably imperiling employee safety."); *Miller* v. *Charleston Area Med. Ctr.*, No. 2:23-CV-00340, 2024 WL 4518293, at *4 (S.D.W. Va. Oct. 17, 2024) ("Courts have also found an undue burden by calculating a hospital's non-economic costs," including the "potential risk" posed by an "unvaccinated employee.") (discussing cases); *Hall* v. *Sheppard Pratt Health Sys., Inc.*, 749 F. Supp. 3d 532, 544 (D. Md. 2024) ("Increased health and safety risks—including risks to the continued operation of the business due to employee illness and death—may likewise impact the conduct of a business.") (internal quotation marks and citation omitted) (collecting cases).

In support of its undue hardship argument, Lutheran Village argues that Ms. Dodson's position required her to have close, in-person contact with elderly residents, who were a medically vulnerable population, and coworkers. ECF No. 45-1 at 5–6. Lutheran Village further

contends that Ms. Dodson's unvaccinated status presented "a potential avenue for exposure to the COVID-19 virus," *id.* at 6, and that its decision to deny her accommodation "was [predicated] on the desire to minimize the risk of the spread of the COVID[-19]," *id.* at 1, and "save lives," *id.* at 6.  The undisputed material facts support Lutheran Village's position.

Consideration of "all relevant factors in the case at hand," *Groff*, 600 U.S. at 470, requires contextualization of Ms. Dodson's accommodation request.  Lutheran Village's employee vaccination policy, which predated COVID-19, was put into place because Lutheran Village serves individuals with high health risks and needs to maintain a safe and healthy environment for residents and employees.  ECF No. 48-7 at 38–39.  As the Supreme Court has observed, "[v]accination requirements are a common feature of the provision of healthcare in America: Healthcare workers around the country are ordinarily required to be vaccinated for diseases such as hepatitis B, influenza, and measles, mumps, and rubella."  *Biden* v. *Missouri*, 595 U.S. 87, 95 (2022) (citing CDC, *State Healthcare Worker and Patient Vaccination Laws* (Feb. 28, 2018) (citation to a now-expired [www.cdc.gov](www.cdc.gov) webpage omitted)).  Indeed, state and federal officials imposed vaccine mandates on skilled nursing facilities like Lutheran Village and other similar facilities.  ECF No. 45-3 at 56:18–57:7; Medicare and Medicaid Programs: Omnibus COVID-19 Health Care Staff Vaccination (Omnibus COVID-19 Health Care Staff Vaccination), 86 Fed. Reg. 61,555-01; *see also Biden*, 595 U.S. 87, 92-93 (holding that the Secretary of Health and Human Services did not exceed his statutory authority by requiring healthcare facilities to ensure their staff were vaccinated against COVID-19, absent a medical or religious exemption, in order to receive federal Medicare and Medicaid funding).

COVID-19 is a "severe acute respiratory illness."  *South Bay United Pentecostal Church* v. *Newsom*, 140 S. Ct. 1613, 1613-1614 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief); *see also Slidewaters LLC* v. *Washington State Dep't of Lab. & Indus.*,

4 F.4th 747, 752 (9th Cir. 2021) ("COVID-19 is a novel, potentially deadly, severe acute respiratory illness caused by a virus that is most commonly transmitted person to person.") (citing *South Bay United Pentecostal Church*, 140 S. Ct. 1613); Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. at 61,556 ("COVID-19 has [ ] significant negative health effects," including "hospitalization, mortality, and post-COVID conditions."). COVID-19 "also has significant, detrimental effects" after the illness, including "nervous system and neurocognitive disorders, cardiovascular disorders, gastrointestinal disorders, and signs and symptoms related to poor general well-being, including malaise, fatigue, musculoskeletal pain, and reduced quality of life." Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. at 61,557. "SARS-CoV-2 [(severe acute respiratory syndrome coronavirus 2)], the virus that causes COVID-19 disease, is highly transmissible." *Id.* at 61,557. "Because people may be infected but asymptomatic, they may unwittingly infect others." *South Bay United Pentecostal Church*, 140 S. Ct. 1613. "[P]eople over the age of 65 or those with underlying health conditions are particularly at risk of contracting a serious or fatal case of COVID-19 (we refer to these individuals as 'high-risk people')." *People First of Alabama* v. *Secretary of State for Alabama*, 815 Fed. Appx. 505, 506 (11th Cir. 2020) (Rosenbaum, J. and Jill Pryor, J. concurring); *see also Golden* v. *Werner*, Civil Action No. RDB-20-2480, 2021 WL 5390344, at *11 (D. Md. Nov. 17, 2021), *aff'd*, No. 22-6034, 2024 WL 2953130 (4th Cir. June 12, 2024) ("COVID-19 is a highly contagious disease that is potentially fatal, especially for individuals in high risk categories.").

In the fall of 2021, "the Delta variant of COVID-19 [ ] emerged as a safety risk," *United States* v. *Colon*, 64 F.4th 589, 591 (4th Cir. 2023), followed by the Omicron variant, both of which resulted in "deadly surges in COVID-19," *Eden, LLC* v. *Just*., 36 F.4th 166, 171 (4th Cir. 2022). "In September 2021, the United States averaged more than one million cases per week and, in October 2021, more than 10,000 Americans on average were dying each week from the

disease." *Yockey*, 2025 WL 860158, at *5 (citing COVID-19 U.S. Cases, World Health

Organization) (citation to a now-expired data.who.int webpage omitted)); *see also United States*

v. *Guest*, Civil Action No. ELH-16-0499, 2022 WL 2104492, at *11 (D. Md. June 9, 2022)

(discussing COVID-19 variants and infection trends).  Thus, at the time Lutheran Village was

assessing Ms. Dodson's second religious accommodation request, COVID-19 presented a

significant threat to the health and safety of its employees and residents.

      As detailed previously, *see supra* I.A, Ms. Dodson's position as an occupational therapist

at a skilled nursing facility required her to have very close physical contact with elderly,

medically vulnerable individuals who resided at Lutheran Village.  Lutheran Village's decision

to deny Ms. Dodson's second request for a religious exemption was informed by the number of

COVID-19 fatalities, guidance from federal and state public health agencies and religious

leaders, the vaccines' approval status, and its need to manage risk to prevent infection of its

employees and the high-risk population they served.  Lutheran Village denied Ms. Dodson's

accommodation request because it believed that a layered approach involving the use of PPE,

testing, and vaccination was the best way to manage risk; prevent transmission of the virus; and

protect its employees and residents, many of whom had become ill and died because of COVID-

19.  A common-sense assessment of the facts and circumstances of this case leads the Court to

conclude as a matter of law that granting Ms. Dodson a religious accommodation would have

presented an undue hardship.  *E.g.*, *Yockey*, 2025 WL 860158, at *6 (noting that the defendant

hospital's "daily work of serving vulnerable patients is central to a 'common sense' analysis");

*Marucci* v. *Greater Baltimore Med. Ctr., Inc.*, Civil Action No. ABA-23-510, 2025 WL 860137,

at *7 (D. Md. Mar. 18, 2025) (finding it reasonable for the defendant hospital to "to insist upon

strong measures to prevent potential COVID-19 transmission to patients").  No reasonable jury

could find the contrary based on the available evidence in the summary judgment record.

Indeed, courts in this Circuit—and across the nation—have repeatedly found similar facts and circumstances constitute undue hardship, both with respect to the COVID-19 and influenza vaccines. *Miller*, 2024 WL 4518293, at *5 ("Historically, being forced to accommodate an unvaccinated employee has been more than enough to pose an undue hardship for medical facilities across our nation actively combatting the COVID-19 pandemic even today."); *accord Yockey*, 2025 WL 860158, at *6 (COVID-19); *Marucci*, 2025 WL 860137, at *6 (same); *Hall*, 749 F. Supp. 3d at 547 (same); *French* v. *Albany Med. Ctr.*, No. 1:22-CV-252 (MAD/DJS), 2024 WL 2958461, at *12 (N.D.N.Y. June 12, 2024) (influenza); *Aukamp-Corcoran* v. *Lancaster Gen. Hosp.*, Case No. 19-5734, 2022 WL 507479, at *8 (E.D. Pa. Feb. 18, 2022) (same); *Robinson* v. *Children's Hosp. Bos.*, No. CV 14-10263, 2016 WL 1337255, *9 (D. Mass. Apr. 5, 2016) (same).[7]

Ms. Dodson's arguments to the contrary are unavailing. First, Ms. Dodson advances several arguments that lack evidentiary support. Ms. Dodson contends that "asymptomatic unvaccinated persons do not present a danger of transmitting the virus" and that granting exemptions to "a small number of employees [ ] would not increase the risk of spread of the viruses." ECF No. 48-1 at 8, 14. These assertions rest on the opinion of her untimely, previously undisclosed expert, which is not properly before the Court for the reasons stated previously. *See supra* II.B. Her argument regarding the efficacy of COVID-19 vaccines (ECF No. 48-1 at 13) fails for the same reason. As a corollary to this argument, Ms. Dodson objects that Lutheran Village has not adduced scientific or medical evidence to prove (1) the efficacy of the COVID-19 vaccine or (2) that "close proximity" increases the risk of spreading COVID-19. ECF No. 48-1 at 8–9. Such evidence is not required. *E.g.*, *Rodrique* v. *Hearst Commc'ns, Inc.*,

---

[7] Cases finding undue hardship where an unvaccinated healthcare employee seeks a religious accommodation are legion. These citations represent a small fraction of the reported decisions addressing this issue.

126 F.4th 85, 91 (1st Cir. 2025) (rejecting plaintiff's argument that summary judgment was erroneously granted because the employer did not proffer expert testimony establishing that the vaccine protects against transmission of COVID-19).[8]

Ms. Dodson also argues that Lutheran Village did not grant *any* religious accommodation request, whereas "many other employers" exempted her from their COVID-19 vaccine mandates based on her religious beliefs. ECF No. 48-1 at 3–4, 10–11. Yet, neither party presented evidence in connection with their summary judgment filings regarding Lutheran Village's disposition of other religious accommodations requests at the time it denied Ms. Dodson's request or the actions taken by other employers regarding Ms. Dodson's religious accommodation requests. In any event, such matters are irrelevant to the Court's assessment of the circumstances surrounding Lutheran Village's denial of Ms. Dodson's religious accommodation, which the Supreme Court has instructed must be evaluated by "tak[ing] into account all relevant factors *in the case at hand*." *Groff*, 600 U.S. at 470 (emphasis added).

Second, Ms. Dodson advances a bevy of arguments that do not materially alter the Court's undue hardship analysis. Ms. Dodson posits that Lutheran Village's concession that no financial costs were associated with the requested exemption defeats its undue hardship defense. ECF No. 48-1 at 15. This misses the mark, as Lutheran Village bases its undue hardship defense on noneconomic costs, *i.e.*, the health and safety of its residents and employees. Evidence of economic costs are therefore unnecessary. *E.g.*, *Luxton* v. *Washington State Dep't of Veterans Affs.*, No. 3:23-CV-05238-DGE, 2025 WL 896658, at *15 (W.D. Wash. Mar. 24, 2025)

---

[8] Nor is the testimony of Lutheran Village's corporate representatives impermissible lay opinion testimony, as Ms. Dodson contends. ECF No. 48-1 at 8–9.; *Rodrique* v. *Hearst Commc'ns, Inc.*, 126 F.4th 85, 93 (1st Cir. 2025) (human resource official's testimony describing the employer's decision-making process and conclusion regarding the requested religious accommodation was a factual statement, not an impermissible lay opinion).

("[W]here non-economic factors—health risks in this case—drive the undue hardship analysis, evidence of monetary burdens is not required.").

Ms. Dodson also contends that Lutheran Village's consultation with religious leaders and reliance on the direction and guidance of public health officials are an insufficient basis on which to deny Ms. Dodson's accommodation. ECF No. 48-1 at 11–12. This argument cuts in favor of Lutheran Village. The undisputed material facts establish that Lutheran Village based its decision on these and many other factors, including the duties of Ms. Dodson's position, COVID-19-related illnesses and deaths of residents and employees, and the degree of protection offered by other preventative measures. *See supra* I.A. In other words, a broad spectrum of data informed Lutheran Village's decision to deny the accommodation request. Moreover, as Lutheran Village correctly notes, an employer's reliance on the recommendations of public health officials is reasonable in such circumstances. ECF no. 54 at 7 (collecting cases from various federal district courts); *see also Rodrique*, 126 F.4th at 91 (holding that an employer "acted reasonably when it determined that vaccinated employees are less likely to transmit COVID-19 than unvaccinated employees" based on "the views of public health authorities"); *Efimoff* v. *Port of Seattle*, No. 2:23-CV-01307-BAT, 2024 WL 4765161, at *13 (W.D. Wash. Nov. 13, 2024) (finding that the employer "properly made its accommodation decision after evaluating public health data and guidance related to transmission and infection rates associated with unvaccinated individuals and assessing those risks in the context of [plaintiff's] job duties and work environment"); *Hailey* v. *Legacy Health*, No. 3:23-CV-00149-IM, 2024 WL 4253238, at *14 (D. Or. Sept. 20, 2024) (deciding that the defendant healthcare provider "reasonably concluded" that state and federal public health agency guidelines "bore indicia of validity and reliability" and properly incorporated it into its religious accommodation decision-making).

The reasonableness of reliance on public health guidance during a global pandemic renders the vaccine's FDA approval status at the time Lutheran Village denied the accommodation request irrelevant to the Court's undue hardship analysis.  Regardless of whether it had emergency use authorization or full approval, public health officials recommended, and then mandated in certain circumstances, use of the vaccine to help combat infection and the spread of COVID-19.  ECF No. 48-7 at 40–49 (May 10, 2021 correspondence in which the FDA communicated its conclusion that, "based on the totality of the scientific evidence available to the FDA, [ ] it is reasonable to believe that the Pfizer-BioNTech COVID-19 Vaccine may be effective in preventing COVID-19"); Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61,555-01; *see also Biden*, 595 U.S. at 95 (noting that "healthcare workers and public-health organizations overwhelmingly support[ed]" the rule requiring vaccination of healthcare workers).  Ms. Dodson's argument that Lutheran Village's denial was "arbitrary and capricious" because the vaccine was under emergency use authorization (ECF No. 48-1 at 12–13) is legally unsupported and factually contested.  ECF No. 48-7 at 12:11–13:1, 79:5–7 (testifying that an unspecified COVID-19 vaccine had full FDA approval at the time of Lutheran Village's denial).

Finally, Ms. Dodson argues that she "strictly complied with Lutheran Village's workplace requirements to prevent the spread of the virus."  ECF No. 48-1 at 4.  This fails for two reasons.  First, following denial of her religious accommodation request Ms. Dodson did *not* comply with Lutheran Village's vaccination requirement, which is the basis for her termination and filing of the instant action.  Second, Ms. Dodson offers only argument, not evidence, to establish that her proposed accommodation, *i.e.*, the use of PPE, distancing and sanitary protocols, temperature checks, and testing, were reasonable.  *Id*.  There is no evidence in the summary judgment record to controvert Lutheran Village's "conclusion that vaccinated people are less likely to infect others."  *Rodrique*, 126 F.4th at 93.

The Fourth Circuit Court of Appeals has long recognized that "an employer is not required 'to wait until it [feels] the effects' of the proposed accommodation before determining its reasonableness." *Firestone Fibers & Textiles Co.*, 515 F.3d at 317 (alternation in original) (internal citations omitted).  Thus, Lutheran Village was not required to accept increased risk to the health and safety of its employees and elderly, medically vulnerable, high-risk residents because of Ms. Dodson's religious beliefs.  *Yockey*, 2025 WL 860158, at *6; *Marucci*, 2025 WL 860137, at *6.  Nor was Lutheran Village required "to provide the accommodation that [Ms. Dodson] prefer[ed]." *We The Patriots USA, Inc.* v. *Hochul*, 17 F.4th 368, 370 (2d Cir. 2021).  Summary judgment in favor of Lutheran Village is appropriate because the undisputed material facts establish that Ms. Dodson's requested accommodation presented a threat to the health and safety of Lutheran Village's residents and employees, thus presenting an undue hardship to the conduct of its business.[9]

## III.    CONCLUSION

For the foregoing reasons, it is hereby ordered that Lutheran Village's renewed motion for summary judgment (ECF No. 45) is granted, and Ms. Dodson's motion for leave to produce evidence and modify the scheduling order (ECF No. 55) is denied.  A separate Order follows.

Date: May 22, 2025                                    _____/s/_____
                                                      Erin Aslan
                                                      United States Magistrate Judge

---

[9]  It is unclear whether Ms. Dodson also asserts a retaliation claim.  Her Complaint alleges that Lutheran Village reduced her scheduled hours after she requested a religious accommodation (ECF No. 1 at 11 ¶ 8), but she indicated elsewhere in the pleading that the only discriminatory conduct she complained of was termination (*id.* at 5).  It is unknown whether Ms. Dodson administratively exhausted this claim, as her Equal Employment Opportunity Commission charge is not part of the summary judgment record.  The parties do not address retaliation in their summary judgment filings.  Thus, there is no evidence in the record to support any such claim.  Accordingly, even if it were properly before the Court, summary judgment in favor of Lutheran Village would be appropriate.